**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

September 25, 2025

*Via Email and CM/ECF*
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: ***United States v. Hector Quezada***
 **24 Cr. 715 (PKC)**

Dear Judge Castel,

  As required by the written plea agreement between the parties, I write to respectfully request that the Court sentence Hector Quezada to three years' imprisonment. A substantial variance from the advisory guidelines range is justified because of the unique and challenging circumstances of this case, particularly Hector's diminished culpability due his young age, his intellectual challenges, and his father's aggravating role in the offense.

  Hector is a lawful permanent resident who was barely 18 years old when his father brought him into a preexisting sophisticated scheme to press, package, and distribute thousands of fentanyl pills from their family's home in Philadelphia. In doing so, Hector's father took advantage of his teenaged son, who suffers from longstanding cognitive deficits that made him especially susceptible to his father's influence and manipulation of their close relationship. His father did the exact opposite of what a parent should do: he pulled his son into a dangerous drug conspiracy without any regard for Hector's safety or future.

  Still, despite his father's greater legal and moral culpability, Hector also exercised extremely poor judgment in agreeing to join the operation, and he exercised even worse judgment when his father gave him a handgun that he stored in his bedroom. Hector is extremely remorseful and contrite, and he fully understands that his conduct will have permanent consequences. Indeed, in addition to a substantial prison term, Hector is almost certain to lose his residency status and suffer permanent banishment from the United States.

For the past 26 months, while out on bail, Hector has shown the Court and his family that he can lead a productive, law-abiding life unmarred by his father's poor influence. Hector works full-time, gives his mother his salary to help with the family's bills, and is an emotional support system for his siblings, including those with severe medical issues. Given these realities and the totality of Hector's circumstances, a sentence of more than three years is greater than necessary to specifically deter and punish him and promote respect for the law.

The Presentence Report accurately reflects Hector's childhood and adolescence. Born in May 2005 in the Dominican Republic, Hector grew up the only son to Yesenia and Hector Antonio Noboa Quezada. Hector has four full sisters, the youngest of which has struggled since she was a year old with cancer and other serious health complications. She has had multiple surgeries to treat cancerous tumors throughout her body and continues to receive radiation and other related treatment every six months.

For the first ten years of his life, Hector spent most of his time in the Dominican Republic. He would intermittently travel to Pennsylvania to attend school while living with his paternal aunt in Philadelphia. Hector eventually immigrated to the United States permanently with a green card and has lived in Philadelphia since then. Hector has a high school diploma.

A few short weeks after he turned 18 years old, in or about June 2023, Hector's life changed forever. Unbeknownst to Hector, his father had been receiving packages of fentanyl powder in the mail and was working in the basement of his family's house with Hector's brother-in-law to press and package the pills. Hector's father let him in on the secret and solicited his help in dropping off the packages at the post office for shipment. Not wanting to disappoint his father, Hector agreed. Eventually, Hector's father relied on him more and more; he asked his son to become more enmeshed in his operation. At his father's behest, Hector began assisting with the pressing and packaging of the pills.

On July 13, 2023, a mere few weeks after Hector joined in his father's narco-conspiracy, Hector and his father were arrested and presented in the instant case. Hector's father was remanded while Hector was able to make bail. Since then, Hector has lived an inscrutable and law-abiding life. Although he was initially subjected to home detention, given his progress and perfect compliance with supervision, the condition was modified to a curfew. Indeed, for the past 26 months, Hector has never incurred a single bail violation. Presently, Hector works as a forklift operator at a fake meat processing plant, a job that plays to his strengths. Hector is affable and follows directions well. He is quiet but funny and gets along

2

with everyone at his job. He has never failed to provide his Pre-Trial Services officer with paystubs or proof of employment, and the bulk of Hector's paychecks go to his mother, who relies on them to support herself and the family.

There is no downplaying the tragedy of Hector's situation. His introduction to adulthood was marred by his father's absurd decision to rope him into a massive drug conspiracy. It is hard to imagine a more selfish and terrible thing for a parent to do to his child. And yet, although Hector has stopped talking to his father beyond saying hello and goodbye over the telephone, he still cannot bring himself to hate his father.

While the defense agrees with Probation's reasons for a substantial downward variance, a larger reduction in Hector's sentence is warranted, consistent with section 3553(a). Properly accounting for these factors, and consistent with the defense's commitment in the parties' plea agreement to not seek a sentence less than 36 months, we respectfully submit that a sentence of no more than 36 months' incarceration, with structured, intensive supervision, would be sufficient, but not greater than necessary to achieve the statutory goals of sentencing. While the Court need not find "extraordinary" circumstances to impose a below-Guidelines sentence, *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc), such circumstances are present in this case.

### *Hector's young age at the time of his offense weighs heavily in favor of a substantial downward variance.*

It is widely acknowledged in the neuroscience field that the brain's frontal lobes, responsible for the executive functions of planning for the future, problem-solving, and self-regulation, continue to develop well into one's mid-20's. Indeed, "even when teenagers' cognitive capacities come close to those of adults, adolescent judgment and their actual decisions may differ from that of adults as a result of psychosocial immaturity. Among the psychosocial factors that are most relevant to understanding differences in judgment and decision making are (a) susceptibility to peer influence, (b) attitudes toward and perception of risk, (c) future orientation, and (d) the capacity for self-management . . . . In other words, to the extent that adolescents are less psychosocially mature than adults, they are likely to be deficient in their decision-making capacity, even if their cognitive processes are mature."[1]

---

[1] Laurence Steinberg & Elizabeth Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility and the Juvenile Death Penalty*, American Psychologist (Jan. 2004).

3

An emerging body of caselaw and positive law is consistent with the applicable medical and social science data. As the Supreme Court has explained, "children are constitutionally different from adults for purposes of sentencing," *Miller v. Alabama*, 567 U.S. 460, 471 (2012), a principle that "requires the district court to undertake additional reflection on the special social, psychological, and biological factors attributable to youth," *United States v. Delgado*, 971 F.3d 144, 159 (2d Cir. 2020). The Supreme Court has recognized that the "significant gaps" in adolescent maturity and developmental vulnerability to outside influence are highly relevant to sentencing. *Miller*, 567 U.S. at 471. In *Miller*, the Supreme Court noted that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 472; *see also Graham v. Florida*, 560 U.S. 48, 68, 74 (2010) (noting that it is well-established that "juveniles have lessened culpability," "are less deserving of the most severe punishments," and have a greater "capacity for change" (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)); *Gall*, 552 U.S. at 58 (holding that "it was not unreasonable for the District Judge to view [21-year-old] Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future"); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (finding, in the case of a 19-year-old convicted of murder, that there "is no dispute that a defendant's youth is a relevant mitigating circumstance . . . . Our cases recognize that 'youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage'" (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982))).

Judge Rakoff has written about how this change in courts' "understanding of adolescence and adolescent cognition" impacts the sentencing analysis under section 3553(a)(2). *United States v. Ramsay*, 538 F. Supp. 3d 407, 423 (S.D.N.Y. 2021). As Judge Rakoff noted, "the frontal lobes, home to key components of the neutral circuitry underlying executive functions such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." *Id.* at 417-18 (quotation omitted). For these reasons, "courts cannot simply treat anyone over 18 as an 'adult' for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent." *Id.* at 423; *see also Gall*, 552 U.S. at 58 ("Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five." (quoting district court with approval)).

This has several implications for a court sentencing someone who was an adolescent at the time of his offense conduct, all of which weigh in favor of leniency. "Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean 'their irresponsible conduct is not as morally reprehensible as that of an adult.'" *Ramsay*, 538 F. Supp. 3d at 423 (quoting *Roper*, 543 U.S. at 570). Further, there is less deterrent value in significant sentences for young offenders because adolescents are less likely to consider potential punishment when making decisions, frequently influenced by their peers. *Id.* There is also a reduced need to incapacitate adolescent offenders because their character remains in development, and thus "adolescent crime is a poor predictor of future criminal behavior." *Id.* And lastly, "adolescents' slow but steady development of means of self-control make rehabilitation and successful reintegration into society more likely than for similarly situated adult offenders." *Id.*[2]

Last year, the Sentencing Commission further validated this consensus, amending the Sentencing Guidelines, as the Commission noted, "[i]n line with the Commission's statutory duty to establish sentencing policies that reflect 'advancement in the knowledge of human behavior as it relates to the criminal justice process.'" U.S. Sent. Comm'n, *Amendments to the Sentencing Guidelines* (Apr. 30, 2024) at 25 ("Youthful Individuals") (quoting 28 U.S.C. § 991(b)(1)(C)).[3] As the Sentencing Commission described, the amendment it adopted "reflects the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability," as well as "expert testimony to the Commission indicating that certain risk factors may contribute to youthful involvement in criminal justice systems." *Id.*

The Sentencing Commission amended the policy statement at section 5H.1 of the Guidelines to provide that:

---

[2] The observation that criminal behavior increases in adolescence and decreases in adulthood is known as the "age-crime curve" and is "one of the most established facts in the field of criminology." L. Kazemian, Nat'l Inst. of Justice, *Pathways to Desistance from Crime Among Juveniles and Adults: Applications to Criminal Justice Policy and Practice* (2021) (citing E.P. Mulvey, Dep't of Justice, Office of Juvenile Justice and Delinquency Prevention, *Highlights from Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders* (2011) (noting this is true even among those who engage in more serious crime)).

[3] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf

A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

The reasons behind the Commission's Guidelines amendment and the growing body of caselaw surrounding the reduced culpability of adolescent defendants weigh heavily in favor of a significant downward variance for Hector—a vulnerable, impaired young man who was functioning at a much lower level at the time of his offense than his 18 years of age would suggest.

***Hector's destructive dynamic with his father and diminished intellectual capabilities also weigh heavily in favor of a substantial downward variance.***

Hector would have never engaged in drug dealing of any kind had it not been for his father, who arranged for fentanyl powder and other mixers to arrive to his family's home and created a pill pressing and distribution center in his basement. Rather than protect his family and guide his son along a right path, Hector's father selfishly and without any regard for his family's wellbeing brought dangerous drugs into their home and cajoled his son into becoming an accomplice. It was at his father's behest that Hector first started driving his father to the post office to drop off packages filled with fentanyl pills, and it was at his father's direction that he became more enmeshed in the packaging and distribution of the dangerous narcotics. Although Hector certainly bears responsibility for his poor decision-making, his father is clearly more culpable because he took advantage of his son, who was barely three weeks into his 18th birthday.

Unfortunately, Hector was particularly susceptible to his father's manipulation given their close relationship as his only son and due to his own intellectual deficits and challenges. In connection with this case, Dr. Megan Seltz, a respected and established neuropsychologist, evaluated Hector to assess his cognitive functioning, intelligence, mental health, and sociability. After thorough, one-on-one testing and evaluation, Dr. Seltz determined that Hector suffers from longstanding cognitive deficits, including a neurocognitive disorder, and other mental health issues that made him especially susceptible to his father's negative influence and manipulation of their close relationship. As Dr. Seltz writes:

> Hector evidenced a low fund of knowledge (low cognitive ability) and meets criteria for a neurocognitive disorder. Factors that impact Hector's neurocognitive disorder include a low baseline level of intelligence, difficulties with higher-order cognitive functions, such as abstract reasoning, and having a dependent personality style. Hector evidenced parent-child relational difficulties, likely past neglect, and possibly psychological abuse by his father, Hector Antonio Noboa, and other family members. There is no evidence that Hector was physically abused by his father or other family members. Testing revealed Hector's tendency towards acquiescence, especially when pressured by loved ones at a young age. His neurocognitive difficulties are chronic and impact him in multiple domains of functioning.

Exhibit A (Dr. Seltz Report) at 2.

Although Hector's father was not physically violent against Hector or his siblings, he was emotionally abusive and manipulating, and he exercised substantial coercive control over his son. Their dynamic is evidence of a serious, diagnosable dysfunction, as Hector suffers from Parent-Child Relational Problem (DSM-5 V61.20); Child Psychological Abuse (DSM-5 995.51); and Child Neglect (DSM-5 995.52). Ex. A at 3-4. Hector's neurocognitive disorder is also illustrated by extreme challenges in higher-order cognitive processing, which "exacerbates [his] concrete thinking style" and renders him "particularly compliant and vulnerable to participation in the Charges." *Id.* at 9. Hector felt substantial pressure to follow his father's directions and assist him in selling drugs. As Dr. Seltz writes:

> Regarding the diagnosis of a parent-child relational disorder, Hector reported an entangled and enmeshed family dynamic, which impacted his decisions throughout his life at times. Hector described his father as being coercive and domineering. Hector's father, Hector Antonio Noboa, asked a lot of Hector throughout his life regarding family-

7

related responsibilities. To Hector's credit, his participation in the Charges was more of an order from his father than an option. Hector did not feel that there was a choice, especially given his young age and family position as the eldest son. Hector denied being threatened directly, but it was expected that he would comply with family-related requests. The fact that the family was domiciled together and Hector was young, there seemed to be few options for him. Declining participation in the Charges would have been uncharacteristic of Hector in light of the family dynamic and extreme pressures and would have resulted in negative consequences.

*Id.* at 5.

Crucially, the substantial pressure Hector felt to please his father helps explain why ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[4]

---

[4] It is undisputed that Hector possessed a handgun in the same house out of which he was packaging and distributing drugs. He ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ received a specific offense enhancement for the firearm in his guidelines calculation. But while this fact, standing alone, may seem aggravating, it does not undermine the substantial mitigation presented by his age and intellectual dysfunction. Indeed, Hector has no criminal record whatsoever, let alone a history of dealing with firearms, and he never, fired, brandished, or used the weapon. Hector never took the firearm with him on his trips to the post office alongside his father, and he never otherwise kept it on his person. Rather, Hector received the handgun from his father and kept it in his bedroom, where it remained until his arrest. Thus, unlike his father, who abused his concealed carry permit to carry a handgun on him every time he went to the post office with Hector to ship drugs in the mail, Hector's possession of a handgun was gratuitous and an obvious extension of his father's manipulation. Exhibit A at 5.

***Hector's exceptional post-offense rehabilitation, particularly his steady employment, weigh further in favor of a substantial downward variance.***

For the past 26 months, Hector has been an exemplary pre-trial releasee. He does not have any violations and maintains a strong rapport with his pre-trial officer. Indeed, after fully complying with the strict requirements of his home detention for nearly a year, and with the support of his pre-trial officer, Hector eventually received an easing of his location monitoring conditions to facilitate his employment. With his father in jail and unable to exert negative, coercive control over his son, Hector has been able to start fresh and, for the past several months, has been working for a vegan food plant where he helps to prepare and package plant-based meat. The tedious job is perfect for Hector, who loves the feeling of being productive and of helping to provide for his family through an honest living.

Against this backdrop, 36 months' imprisonment would be an incredibly long sentence for this 20-year-old who had never received even a parking ticket before his arrest in this case. A longer term of imprisonment is not needed to reflect the seriousness of the offense, promote respect for the law, or provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

Nor would additional incarceration beyond 36 months further promote the goals of either general or specific deterrence. *See id.* § 3553(a)(2)(B). With respect to general deterrence, 36 months of incarceration, followed by years of supervised release (assuming Hector is not deported), is a severe sentence particularly for someone with no prior criminal history. Social science data confirm that general deterrence is advanced by the certainty of punishment, not the severity of the sentence imposed. Put another way, data confirm that more severe sentences are not more effective at promoting general deterrence. *See* M. Tonry, *Purposes and Functions of Sentencing*, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). There is simply no indication that deterrence is influenced by an increase in punishment levels. G. Kleck et al., *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 CRIME & DELINQUENCY 1006, 1032 (2013); *see also* A. von Hirsch et al., CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF RECENT RESEARCH 1 (1999) (survey of criminological research find that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); R. Paternoster, *How Much Do We Really Know about*

9

*Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765, 818 (2010) (noting that there is "no real evidence of a deterrent effect for severity").

As to specific deterrence, a sentence greater than 36 months is plainly unnecessary. As described herein, in Dr. Seltz's report, and in Hector's mother's letter to the Court (Exhibit B), Hector has been chastened by his crime. His profound regret and sorrow have been amplified by the pain and collateral consequences that have been inflicted on his family. Hector wishes for nothing else than to be able to work, support his family, and help them overcome this tremendous trauma perpetrated by their patriarch. Given Hector's overwhelmingly positive behavior while on pre-trial supervision, other sentencing factors may call for a period of incarceration, but further deterring Hector from criminal conduct is not one of them.

Social science data also supports the conclusion that Hector presents a low risk of recidivism and that a lengthy period of incarceration is unnecessary to "protect the public from further crimes." 18 U.S.C. § 3553(a)(2)(C).

As the Sentencing Commission and the policies behind the Sentencing Guidelines make clear, "first offenders are less culpable and less likely to re-offend." U.S. Sent'g Comm'n, *Recidivism and the "First Offender,"* at 1, 9 (2004);[5] *see* U.S.S.G. § 4A1.1, Introductory Comment. Accordingly, as the Sentence Commission has written, first offenders "are deserving of reduced punishment." *Recidivism and the "First Offender," supra* at 1. Separate and apart from lower recidivism rates, first offenders are considered less culpable because their offense is more properly understood as an aberration from their true character and less reflective of ongoing criminal intent. *Cf. United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (reasoning that because "Criminal History I did not fully account for [the defendant's] complete lack of criminal history, considering it as a mitigating factor was not redundant or improper").

Sentencing Commission data corroborate that first offenders are less likely to re-offend. U.S. Sent'g Comm'n, *Recidivism and the "First Offender," supra* at 1, 9. Multiple Sentencing Commission studies have shown that first offenders, like Hector, with zero criminal history points are in a wholly unique category of defendants—one that is least in need of incarceration to prevent rearrest or reconviction. Studies in 2004, 2017, and 2021 all confirmed that offenders with zero criminal history points continue to have by far the lowest rates of recidivism, whether measured by rearrest, reconviction, or reincarceration. *See* U.S. Sent'g

---

[5] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

10

Comm'n, *Recidivism of Federal Offenders Released in 2010*, at 26 (2021);[6] U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6–7 (March 2017);[7] *Recidivism and the "First Offender," supra* at 13.

The Sentencing Commission has explained that "[f]rom both culpability and recidivism risk perspectives . . . offenders with no prior arrests most strongly meet the conceptual definition of the first offender[,]" and with "their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend." *Recidivism and the "First Offender," supra* at 17. Even this "recidivism" rate overstates the risk. Sentencing Commission data show that "the re-conviction rate" for offenders with no prior arrests was only 2.5 percent. *Id.* at 14 n.28.

## *Conclusion*

Hector pleaded guilty and readily accepts responsibility for his crime. At the same time, there is no doubt that his culpability is substantially diminished by his age, intellectual deficits, and his father's aggravating role in encouraging his offense conduct. For all the reasons herein, and for any apparent at Hector's sentencing, the Court should sentence Hector to no greater than 36 months' imprisonment.

Respectfully Submitted,

Andrew John Dalack, Esq.
Assistant Federal Defender, SDNY
(646) 315-1527

Cc:     AUSA Camille Fletcher

---

[6] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf
[7] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf